***********
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy John B. Deluca and the briefs before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission AFFIRMS, with minor modifications, the Opinion and Award of the Deputy Commissioner.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in their Pre-Trial Agreement and at the hearing as:
 STIPULATIONS
1. At the time of the alleged injury by accident, the parties were subject to and bound by the provisions of the North Carolina Worker's Compensation Act.
2. An employer/employee relationship existed between the parties at the time of the alleged injury.
3. The Employer-defendant is self-insured with Key Risk Management Services, Inc. as the administrator.
 ***********
Based upon all of the competent evidence adduced from the record and the reasonable inferences therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 49 years old and had completed high school while in the Army. During his three years in the Army and 17 years in the Reserves, plaintiff received post secondary education training in electronics.
2. Prior to his employment with the Craven County School System, plaintiff was employed as a painter. Craven County Schools hired plaintiff as a painter and when that job ended, he was hired as a maintenance worker. In 1994, plaintiff applied for and was hired as the custodian for H.J. McDonald Middle School.
3. Plaintiff changed schools in 1997 and went to work at Grove City Middle School. His working hours were from 1:30 p.m. to 9:30 p.m. There was normally someone at the school with him until 9:00 p.m. Plaintiff was responsible for locking the school and making sure that everything was secure.
4. Plaintiff's duties required him to clean half of the cafeteria, five to six rest rooms and fourteen to fifteen classrooms.
5. On January 16, 2002, plaintiff was in the process of cleaning the classrooms. Part of his responsibility was to empty the trash. The trash was normally light; however, one classroom had two 11-gallon trash cans full of magazines and another classroom had an 11-gallon trash can and a 6-gallon trash can filled with magazines. Plaintiff emptied all of these trash cans into the large trash bin that he pushed around on his cart.
6. In order to empty his large trash bin, he had to lay the bin down to pull the trash bag out as it was too heavy to lift. Plaintiff then dragged the bag down the stairs before throwing it over his shoulder to carry to the dumpster. It was approximately 40 to 50 yards to the dumpster and he was only able to go 20 yards before having to take a break. Upon arrival at the dumpster, plaintiff realized that the dumpster was full and he had to lift the lid to throw the bag up into the dumpster. Plaintiff felt a strain after lifting and throwing the unusually large trash bag into the dumpster. He described the pain as feeling as if he had "lifted something too heavy."
7. Plaintiff completed his duties and went home. Plaintiff already had a medical appointment scheduled for the following day, January 17, 2002, for an MRI and CT Scan for his stomach and pancreas. When plaintiff awoke he felt pain in his back but dressed and went to his appointment. After the test, he returned home. He planned to report to work at 1:30 p.m., but did not do so as his back was hurting. Instead he called in sick. At the time, plaintiff believed that his back pain resulted from the tests or the condition that caused these tests to be given.
8. Plaintiff awoke on January 21, 2002, and was barely able to get out of bed due to back pain. He presented to Craven Regional Medical Center's Emergency Room. The physician on duty, Dr. Gregory Risk, examined him and reviewed his MRI but did not see anything on the MRI that he thought would cause plaintiff's pain.
9. On Wednesday, January 23, 2002, plaintiff went to see his long-time family doctor, Dr. Stockton, due to continued back pain. Dr. Stockton prescribed medication and referred plaintiff to Dr. Armistead, an orthopaedic specialist.
10. Plaintiff presented to Dr. Armistead on January 28, 2002, and provided a history of back pain since approximately January 16, 2002, and talked about lifting the trash and chairs at work. Dr. Armistead released him from work at that time and recommended physical therapy on the following appointment. Plaintiff failed to improve and on February 18, 2002, Dr. Armistead ordered an MRI. The MRI revealed L5-S1 disc herniation.
11. On February 27, 2002, plaintiff gave a recorded statement describing his injury, which was submitted as an exhibit at the hearing before the Deputy Commissioner. Defendant denied plaintiff's claim in a Form 61, dated March 27, 2002. Plaintiff remained out of work and continued to treat for his back pain. Dr. Armistead referred him to Dr. Tellis of Coastal Physical Medicine and Rehabilitation Services for injections. Despite physical therapy and injections, plaintiff's pain increased and he was ultimately referred to Dr. Dalrymple, a neurologist, in June 2002 for a surgical consultation.
12. On July 3, 2002, plaintiff presented to Dr. Dalrymple, who noted his complaints of back pain with radiation into the buttocks and down the right leg into the foot. The examination revealed diminished reflex in the right ankle jerk. The MRI revealed an extruded disc fragment at L5 on the right side compressing the exiting S1 nerve root. Dr. Dalrymple opined that the extruding disc accounted for plaintiff's leg pain and recommended lumbar discectomy due to plaintiff's failure to improve with conservative care.
13. On July 24, 2002, Dr. Dalrymple planned to schedule surgery for the plaintiff, but due to an apparent abnormal heart rhythm, it was postponed pending a visit to a cardiologist. Plaintiff ultimately did have a heart condition unrelated to his workers' compensation claim and in November 2002, underwent surgery.
14. Plaintiff returned to Dr. Dalrymple on February 6, 2003, prepared to proceed with back surgery. At that time, Dr. Dalrymple recommended a repeat MRI. The MRI of February 6, 2003, did not show the disc protrusion as seen in the February 2002 MRI. Dr. Dalrymple recommended another myelogram due to plaintiff's ongoing pain and the lack of disc protrusion on the latest MRI. Following the myelography, a discogram was scheduled. Dr. Dalrymple opined that plaintiff could have what he termed a "dynamic disc phenomenon," which was confirmed with the discogram.
15. Since the date of the hearing before the Deputy Commissioner, on August 25, 2003, plaintiff has undergone back fusion surgery to the L5-S1 area, and graft removal. After surgery, plaintiff participated in a pain management program with Dr. Long. Dr. Dalrymple removed plaintiff from work from August 25, 2003, until December 4, 2003.
16. On December 4, 2003, Dr. Dalrymple issued restrictions of no repetitive lifting, bending or twisting and no lifting greater than 50 pounds. Dr. Dalrymple opined that prior to plaintiff's surgery in August 2003, plaintiff would have had restrictions of no lifting over 15 pounds and no repetitive bending or twisting. Dr. Dalrymple further stated that during the time he treated plaintiff, he would not have given plaintiff a full duty release. As of the hearing before the Deputy Commissioner, plaintiff had not returned to work per Dr. Dalrymple's directions. Dr. Dalrymple also indicated that plaintiff's wife would need to be out of work for six weeks following plaintiff's surgery to help care for him at home.
17. Prior to plaintiff's injury on January 16, 2002, the plaintiff had reported back pain on only two occasions in the past 30 years and had suffered back pain in conjunction with prostate problems. In addition, plaintiff had been treated for hepatitis C and cirrhosis; however, these conditions were under control and plaintiff could work if it were not for his back pain. Also, plaintiff's prior back pain was isolated to his back and had not radiated into his legs, as has been the case since his January 16, 2002, injury by accident. Furthermore, plaintiff's previous back pain had required little medical attention and had not affected his ability to report to work and perform his job duties as a custodian or earn wages. The plaintiff's back pain since January 16, 2002, resulted in a need for extensive medical treatment and plaintiff has been unable to perform his job.
18. The competent evidence in the record establishes that when the plaintiff threw the trash into the dumpster on January 16, 2002, he sustained a specific traumatic incident to his back.
19. The plaintiff has not reached maximum medical improvement and has not been released to return to work by his treating physician.
20. Plaintiff's average weekly wage is $362.30 and his compensation rate is $241.54.
21. Plaintiff is receiving disability payments through an employer-funded disability program.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. As a direct result of a specific traumatic incident of the work assigned, on January 16, 2002, plaintiff sustained an injury by accident within the course and scope of his employment with the defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. As a result of plaintiff's injury by accident on January 16, 2002, he is entitled to be paid by the defendants temporary total disability compensation at the rate of $241.54 per week beginning January 17, 2002, and continuing until further Order of the Industrial Commission. N.C. Gen. Stat. § 97-29.
3. Plaintiff is entitled to have defendants pay for all medical expenses incurred as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability. N.C. Gen. Stat. §§ 97-2(19); 97-25.
4. Defendants are entitled to a credit for disability benefits paid to plaintiff through an employer-funded disability program. Said amount shall be determined by the parties after reviewing the defendant's company records. N.C. Gen. Stat. § 97-42.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, defendants shall pay to plaintiff compensation benefits at the rate of $241.54 per week for the period beginning on January 17, 2002, and continuing until further Order of the Industrial Commission. Compensation due which has accrued shall be paid to plaintiff in a lump sum.
2. Defendant shall pay all medical expenses incurred or to be incurred, as a result of plaintiff's compensable injury by accident on or about January 16, 2002, for so long as such evaluations, examinations and treatments may reasonably be required to effect a cure, give relief and will tend to lessen the period of plaintiff's disability.
3. A reasonable attorney's fee in the amount of twenty-five percent (25%) of the compensation awarded under Paragraph 1 of this Award is hereby approved for plaintiff's counsel, prior to the application of defendant's credit.
4. Consistent with Paragraph Five of the Conclusions of Law herein, defendants are entitled to a credit for disability benefits paid to plaintiff. Said amount shall be determined by the parties after reviewing the defendant's company records.
5. Defendants shall pay the costs.
This the ___ day of August 2005.
 S/_____________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER